**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

```
------------------------------------------------------------X
JOHN DOE,                                :           Civ. No.
                                         :
                    Plaintiff,           :
                                         :           COMPLAINT
          -against-                      :
                                         :
SAINT ANSELM COLLEGE,                    :           JURY TRIAL
                                         :           DEMANDED
                                         :
                    Defendant.           :
------------------------------------------------------------X
```

      **I.**      **The Nature Of This Action**

      1.      Plaintiff John Doe[1] ("Plaintiff" or "John Doe") seeks relief against Defendant Saint Anselm College ("Saint Anselm" or the "College") following Saint Anselm's wrongful and unjustified imposition of sanctions based on a fellow St. Anselm student's false and unproven allegations of sexual misconduct (the "Incident"). This injustice was the direct result of Saint Anselm's failure to (i) conduct an adequate investigation; (ii) provide Plaintiff with due process as defined by Saint Anselm's own policies; and (iii) its excessive focus on the concerns and interests of the Complainant and the convenience of the College to the total exclusion of the rights and interests of the male respondent John Doe.

      2.      Saint Anselm's precipitous and unjustified actions violated its contract with John Doe, the applicable standard of care under State law and the requirements of Title IX of the Education Amendments of 1972.

---

[1]      Plaintiff files herewith a motion for leave to use pseudonyms.

3.     Saint Anselm's arbitrary and capricious findings have derailed John Doe's education, tarnished his reputation and permanently damaged his future career and educational prospects.

## II.     **Parties**

4.     John Doe is a natural person residing in Old Lyme, Connecticut.  During the events described herein, John Doe was a student at Saint Anselm College and resided on the Saint Anselm College campus in Manchester, New Hampshire.

5.     Upon information and belief, Saint Anselm College is a non-profit corporation organized under the laws of the State of New Hampshire operating as a private liberal arts university located in Manchester, New Hampshire.

6.     John Doe and Saint Anselm are sometimes hereinafter collectively referred to as the "Parties".

## III.     **Jurisdiction and Venue**

7.     This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) John Doe and Saint Anselm are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the claims herein arise under federal law; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

8.     This Court has personal jurisdiction over Saint Anselm on the grounds that Saint Anselm is conducting business within the State of New Hampshire.

2

9.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**Factual Allegations**

10.     In the Spring of 2010, Saint Anselm College offered John Doe admission to the Class of 2014 based on, among other things, his outstanding academic record and extensive extra-curricular achievements. John Doe accepted Saint Anselm's offer with the goal of obtaining a quality liberal arts education to prepare him for a career in criminal justice.  Upon arrival onto Saint Anselm's campus, he was provided with copies of the College's policies, including the 2010-2011 Code of Student Conduct at Saint Anselm College (the "Code").  Upon information and belief, the relevant portions of the 2010-2011 version of the Code remained unchanged in the 2014-2015 version of the Code, which is the version that Saint Anselm applied at the time of John Doe's disciplinary action.

11.     John Doe's first three years at Saint Anselm were fulfilling and productive, as he excelled in his studies while becoming a respected member of his social and academic community.  John Doe was a valued member of the College's varsity football team, having also won a prestigious award, reserved for team members who demonstrate immense work ethic. John Doe also participated in other sports and social activities, and spent his free time working as a volunteer coach for a local police athletic league. In the Fall of 2014, John Doe began his fifth senior year with much anticipation and enthusiasm.

3

**A.  The Evening of September 1, 2014**

12.     On or about September 1, 2014, John Doe and Jane Doe, who were friendly to each other, ran into one another on the street. Prior to their meeting, John Doe had been with friends at a party and had admittedly consumed alcohol. After the party, Jane Doe enthusiastically ran up to John Doe with a bottle of wine in her hand. She seemed excited to see John Doe and reached to give him a hug. Plaintiff and Jane Doe had not spoken in some time and John Doe was therefore surprised by Jane Doe's enthusiasm.

13.     John Doe stopped Jane Doe's exclamations of excitement and told her to keep the wine bottle concealed because they were in the vicinity of some Resident Directors who had strict policies about glass containers in public.

14.     Plaintiff and Jane Doe mutually agreed to go back to John Doe's townhouse, which he shared with three roommates. John Doe entered the key code and opened the door to the building, walked into the building and sat on the couch in the common room. Jane Doe followed him and sat down next to him on the couch. John Doe and Jane Doe had a friendly conversation for a few minutes, and then proceeded to start kissing each other. The kissing was mutual, and became passionate and more intimate. John Doe asked Jane Doe if she wanted to go upstairs to his bedroom.  Jane Doe said "yes" and they proceeded to go up the stairs towards John Doe's bedroom.

15.     On their way to Plaintiff's bedroom, Jane Doe and John Doe walked past several of John Doe's roommates (the "Roommates"), who were entertaining several guests in the kitchen. The Roommates jokingly hooted and hollered at John Doe and Jane Doe, as they assumed they were going upstairs to engage in sexual activity.

16.     Once John Doe and Jane Doe reached John Doe's bedroom, they again began kissing passionately on John Doe's bed. Their kissing gradually became more sensual, and both John Doe and Jane Doe removed their own clothing willingly, as well as helped each other take remove their own clothing. After several more minutes of passionate kissing, Jane Doe asked John Doe if he had a condom. John Doe got out of bed and began to search his desk for a condom but was unable to find one, so he put on a pair of shorts and went downstairs to asked one of the Roommates, "E.G.," if he had a condom.

17.     At that point, there was more hooting and hollering from the Roommates. E.G. insisted on coming up to the room to find the condom for John Doe. Plaintiff then ran upstairs and locked the door and sat down next to Jane Doe in order to protect her from the humiliation of having "E.G." enter the room while she was undressed.

18.     E.G. began to bang on the door, jokingly demanding that John Doe let him in. John Doe informed E.G. that Jane Doe was undressed and asked E.G. to simply tell him the whereabouts of E.G.'s condom. E.G. refused and Jane Doe told Plaintiff: "Just let him in." John Doe covered Jane Doe up with a blanket and let E.G. in.

19.     E.G. entered the room while Jane Doe was sitting in the bed facing E.G. and the rest of the room. Jane Doe was conscious and in high spirits. E.G. located the condom and handed it to John Doe.

20.     After E.G. left Plaintiff's bedroom, Jane Doe seemed embarrassed that she was seen by E.G., and said "I'm not that kind of girl." Jane Doe said nothing further about her embarrassment. John Doe told Jane Doe that he knew she was not that kind of girl. John Doe

5

then dropped the condom on the floor and told her "nothing else needs to happen," meaning that it was acceptable and fine with John Doe if they did not engage in sexual intercourse.

21.     John Doe sat back in bed next to Jane Doe. Jane Doe willingly began to kiss John Doe again. Once again, their conduct grew more passionate. John Doe asked Jane Doe if she felt well. Jane Doe responded that she felt fine.

22.     After a period of passionate kissing, John Doe picked up the condom from the floor and put it on. Jane Doe did not say anything, but spread her legs on her own accord, indicating she was ready to engage in sexual intercourse. John Doe and Jane Doe proceeded to engage in sexual intercourse with varying positions. At some point, Jan Doe was on top of John Doe during the intercourse. Jane Doe moaned with pleasure and was loudly expressing her enjoyment. At one point, John Doe shushed her for fear that the Roommates would hear Jane Doe's moans and continue to hoot and holler as they had earlier in the evening.

23.     Several times throughout their sexual encounter, Jane Doe expressed that she had reached an orgasm. Since John Doe had not yet reached an orgasm, Jane Doe told him he could remove the condom as long as he pulled out and ejaculated on her stomach. John Doe asked Jane Doe if she was sure that she was okay with that, and she said she was. John Doe removed the condom and proceeded to further engage in intercourse with Jane Doe. Soon thereafter, he pulled out and ejaculated on her stomach.

24.     Jane Doe and John Doe then got out of bed to clean themselves up with tissues. They put their clothes back on and John Doe asked Jane Doe if she wanted to sleep over. She told him she would rather sleep in her own apartment. Plaintiff asked if Jane Doe would like him

to walk her back to her apartment. She replied that it was not necessary but he could if he did not mind.

25.     Plaintiff walked Jane Doe back to her apartment. During their walk, John Doe asked Jane Doe if she thought they could ever engage in sexual intercourse again, and she replied that she was not sure and would have to see how she felt about it in the future.

26.     When John Doe and Jane Doe entered Jane Doe's building, Jane Doe walked up the stairs without any trouble and without any assistance. Jane Doe was able to enter her key code into the key pad. At no point did she seem to have any trouble completing these tasks, and did not appear to be intoxicated. Jane Doe did not slur her words or stumble at any point on the evening of the Incident.

27.     As John Doe said goodbye to Jane Doe, he caught a glimpse of her roommates in the bedroom. John Doe then left and went back to his apartment.

28.     In the week that followed, John Doe was unaware that Jane Doe considered herself the victim of sexual misconduct.

**B.      John Doe First Learns of Jane Doe's Allegations of Sexual Misconduct**

29.     On October 6, 2014, at approximately 9:30 a.m., John Doe met with Associate Dean of Students, Andrew S. Litz, ("Dean Litz").

30.     The meeting was for an unrelated incident regarding alcohol involving people unrelated to Jane Doe. As John Doe was leaving the meeting, Dean Litz told him he had to come back later that day at 4:00 p.m. because Alicia Finn, Ph.D. ("Dean Finn"), Dean of Students, also wanted to speak with John Doe.

31.     At approximately 4:00 p.m. that same day, John Doe returned to the Deans' Offices to meet with Dean Finn. Dean Finn greeted John Doe in the waiting room and brought him into Dean Litz's office.  John Doe was in the presence of both Dean Litz and Dean Finn (hereinafter "the Deans"). Dean Finn informed John Doe that this meeting was in regards to a sexual assault accusation. She said she knew it was probably very intimidating to have two deans in front of him and told John Doe to take his time and think as clearly as possible.

32.     Dean Finn advised John Doe not to try to be specific to the question when providing his answers, stating that it would look suspicious to leave things out or to try to only state the bare minimum.

33.     Dean Litz asked John Doe if he knew Jane Doe. John Doe answered affirmatively.

35.     Dean Litz asked Plaintiff if he had ever had sexual relations with Jane Doe. John Doe answered affirmatively.

36.     The Deans asked John Doe to explain all of the events of the evening of the Incident, to the best of his recollection from start to finish.

37.     John Doe proceeded to tell the entire story as best as he could. The Deans stopped him many times to ask questions in order to clarify details.

38.     Dean Finn asked Plaintiff if it was "normal" for girls to be "randomly running up" to him at parties, as he claimed Jane Doe did.  John Doe explained that it is not something that happens all the time but that it definitely does occur.

39.     When John Doe got to the point of the evening of the Incident, when the sexual intercourse had begun, he asked if he had to explain those details as well. Dean Finn told him to skip over them for now.  She later made him go back and explain the details more fully.

40.     Dean Finn asked John Doe if he tried get physical at all with Jane Doe on the night of the Incident or tried to suppress her at any point, such as holding her down, choking her, and/or covering her mouth.  John Doe responded that he did not remember doing anything like that.

41.     The Deans asked John Doe about Jane Doe's wine bottle.  How much was left?  Did she bring it back?  He told them he thought there was approximately a quarter of the bottle of wine left and that, since it was not in his townhouse the next day, she must have brought it with her when she went home.

42.     The Deans asked what John Doe and Jane Doe talked about on their way to Jane Doe's apartment.  John Doe explained that they discussed if this was going to be a "one-time-thing" or if it would ever happen again, and that Jane Doe replied that she did not really know yet and would have to see how she felt about it in the future because "she didn't normally do things like that."

43.     Dean Litz took notes during the interview. John Doe paused several times out of courtesy in order for Dean Litz to write down everything John Doe said accurately.

44.     The Deans asked John Doe if he and Jane Doe had spoken to each other since the evening of the Incident. Plaintiff told the Deans that he saw Jane Doe the very next day at a meeting and that she barely acknowledged him, so he texted her and asked her why she had acted that way towards him.  John Doe told Jane Doe he did not understand why they could not at least

be mature enough to say hello when they saw each other.  Jane Doe agreed and said they could be civil and say hello to each other but that the encounter was just a drunken mistake and it was not going to happen again.  John Doe told her "Say no more. I understand."

45.    John Doe told the Deans that he had deleted those messages as soon as the conversation was over, since he did not want his girlfriend to see them.

46.    After John Doe completed his recitation of the events of the evening of the Incident, the Deans exchanged glances and looked very surprised and puzzled.  They nodded to each other and then Dean Litz asked John Doe, "What motivates her?" John Doe said he did not understand this question.

47.    Dean Litz then asked John Doe if he was surprised to hear Jane Doe was claiming that John Doe has sexually assaulted her. John Doe said he was very surprised.

48.    Dean Litz said Jane Doe claimed she was too drunk to give consent and that her version of the events of the evening of the Incident sounded nothing like Plaintiff's, which sounded very straight-forward and honest.

49.    John Doe told the Deans he was not completely sure about Jane Doe's motivation in making such a serious claim. John Doe explained that Jane Doe was probably ashamed of having a one-night stand, particularly with John Doe who had a reputation for sleeping with a lot of girls.  He surmised that perhaps Jane Doe did not want to admit to herself that she did what she did, but felt that if John Doe had sexually assaulted her she would not place any blame on herself for the guilt she was feeling.

50.    John Doe also expressed another theory to the Deans, wherein Jane Doe may have found out later that John Doe had a girlfriend, filing the complaint out of anger for John Doe's

infidelity and dishonesty. John Doe explained the very brief intimate encounter he and Jane Doe had three or four years prior to the evening of the Incident, at which time Jane Doe had a boyfriend and blamed the stressful situation of her infidelity on John Doe. John Doe explained to the Deans that Jane Doe has held resentment against him since that time.

51.     The Deans stressed the importance of confidentiality for the sake of both John Doe's and Jane Doe's reputations. The Deans said they were relying on John Doe's and Jane Doe's integrity not to discuss the situation with anyone who was not involved.  John Doe assured them that he would not break the confidentiality provisions of the St. Anselm Code.

52.     The Deans also advised Plaintiff that he could not under any circumstances communicate with Jane Doe and that he would receive this instruction in writing.  John Doe never received this notice in writing but complied nonetheless.

53.     The Deans asked Plaintiff if there were any witnesses that could confirm Plaintiff's version of the events of the evening of the Incident.  John Doe responded that the only witnesses to the events were the Roommates and Jane Doe's roommates who saw him standing in the doorway of Jane Doe's apartment.

54.     Dean Finn briefly walked John Doe through the process of the investigation and the process of a possible hearing. She told him he could have one support person, who had to be a member of the College's community and could not be a parent or a lawyer. She also told him that all the rules were the same for both parties.

55.     Dean Finn advised Plaintiff that all of the Deans would be provided to the panel, and she would decide if there was enough to go ahead with the hearing.

56.     Dean Finn told John Doe that he would be notified if there was a need for a hearing.

57.     Plaintiff was asked by Dean Litz to prepare a written statement that night and email it to him.  They asked John Doe to once again, recite the details of the events of the evening of the Incident.

**C.       John Doe Learns that a Hearing will be Conducted**

58.     On or about October 17, 2014, at approximately 1:00 p.m., John Doe was summoned to Dean Finn's office. Dean Litz was also in attendance at that meeting.

59.     Dean Finn advised Plaintiff that a hearing would be held but assured John Doe that it is often just a formality. John Doe was handed him written information about the hearing process, and Dean Fine walked John Doe through the written information.

60.     John Doe was told that the College's hearing process followed and met the standards set by Title IX legislation and briefly explained what Title IX was.

61.     It was explained to John Doe that the level of guilt was based on a "preponderance of the evidence" (more likely than not), and told him the three sanctions were (i) Substantiated (more likely than not); (ii) Unsubstantiated (insufficient evidence and not possible to determine a probable verdict); and (iii) Unfounded (more likely than not that the allegations are untrue).

62.     John Doe was advised of his right to a support person. John Doe informed the Deans that he was deciding between his coach or his counselor, Kristina Wilson. Dean Finn said those were both good options.

63.     Dean Finn mentioned to John Doe that the Roommates and his support person would be kept in a separate room during the hearing and brought in one at a time. Dean Finn explained that none of the witnesses would ever cross paths with Jane Doe and her witnesses and support person.

64.     Dean Finn reiterated that the hearing process was equal to both sides (Jane Doe could appeal and John Doe could appeal; Jane Doe got a support person, John Doe got a support person).

65.     Dean Finn explained to John Doe the appeals process, explaining that he could write an appeal based on a procedural error during the hearing, new evidence unavailable during the time of the hearing, or punishment inconsistent with the offense.

66.     Dean Finn also stated that she had the authority to overrule the sanction but not the ruling if she felt that it was inconsistent with what St. Anselm had done in the past.

67.     Dean Litz told John Doe that the only hearing witnesses would be the Roommates.

**D.      <u>John Doe is Falsely Told He Admitted to Covering Jane Doe's Mouth</u>**

68.     On or about October 23, 2014, John Doe arrived for the hearing and was greeted by Dean Finn. The support person John Doe chose, his counselor Kristina Wilson, was waiting for Plaintiff in her office.

69.     Dean Finn told John Doe that his parents could not be placed anywhere during the hearing because of space issues.

70.     After approximately one or two hours, Katherine Strong came and asked for John Doe and escorted John Doe and Kristina Wilson down the hallway into a conference room where

John Doe met the other two panel members. One was a male and one was a female (Nicole Eyet-Head of the panel)

71.     The hearing began with John Doe reading his written statement. The panel members asked Plaintiff to once again recite the events of the evening of the Incident. When John Doe got to the point in the story which would become sexually explicit, he asked the panel if he could skip the sexual details. Nicole Eyet said yes, so he did. Katherine Strong asked what kind of noises Jane Doe was making during the sexual encounter and if John Doe tried to quiet her.

72.     John Doe said there was moaning and heavy breathing in a sexual way and when she started to scream John Doe just said "shhhhhh."  John Doe explained this was because he did not want The Roommates to hear and come up the stairs to make a scene.

73.     Katherine Strong asked if John Doe and Jane Doe tried to sneak out quietly when they left John Doe's building or if they stopped to talk on their way out.  John Doe said they were not hiding or sneaking out but that they did not stop to talk to anyone; they just walked right out. John Doe also reminded Katherine Strong that it was a one-night-stand which, in his experience, most girls did not want to broadcast to those around them. John Doe also explained that Jane Doe did not know his roommates well enough to stop and engage in conversation with them, particularly in such a situation. The panel members asked for clarification on whether John Doe had spoken to Jane Doe since the night of the Incident. John Doe explained that they had brief exchanges during the senior package meeting and via text message, before he was informed he was barred from contacting her.

14

74.     The panel members informed Plaintiff that Dean Litz had written that John Doe apologized to Jane Doe. This was a clear mischaracterization of what John Doe had previously told Dean Litz. John Doe corrected the panel members, explaining that he did not apologize to Jane Doe for what happened because John Doe did nothing wrong. Rather, John Doe had simply told Jane Doe "I'm sorry you feel that way" in response to her regret over the consensual sexual intercourse.

75.     Shortly thereafter, the Roommates were called in individually to answer the panel's questions. When the Roommates returned to the "waiting room" they discussed what was asked by the panel members. It was clear that their recollection of the evening in question matched John Doe's recollection as well.

76.     Upon information and belief, the Roommates explained to the panel members that they all saw Jane Doe enter the apartment with John Doe, and that Jane Doe appeared sober and coherent and did not seem intoxicated to any degree.

77.     Several hours later, John Doe was called back into the conference room in front of the panel, at which time John Doe was told that the panel members had additional questions about some aspects of his story that "didn't match."  John Doe was asked once again to retell the events of the evening of the Incident, which John Doe then did.

78.     When John Doe reached the part in the story regarding the sexual intercourse itself, John Doe asked again if he needed to provide explicit details. Nicole Eyet responded, "Why not? Might as well at this point."

79.     John Doe proceeded to describe the sexual intercourse.  He went into much detail the same way he described it to the Deans. He was then asked about the wine bottle.  John Doe

explained that it was a narrow bottle that had about a quarter of the bottle left in it.  John Doe also confirmed that Jane Doe brought the bottle back to her own building.

80.     Nicole Eyet asked John Doe to explain the state Jane Doe was in. Plaintiff explained that Jane Doe was a little drunk but was not slurring her words or stumbling. Ms. Eyet then asked John Doe in an accusatory and hostile tone: "Then how did you know she was drunk?" John Doe simply said he recognized intoxication.  John Doe said Jane Doe was very friendly and touchy and outgoing, but was coherent and aware of her surroundings and actions.

81.     The male panel member asked John Doe to describe the inside of the house and asked why the Roommates could not see John Doe and Jane Doe on the couch. Ms. Eyet handed John Doe a note pad so he could draw out the first floor plan.

82.     Ms. Strong asked John Doe again if he had tried to quiet Jane Doe during the sexual encounter. John Doe repeated the same response as he did earlier about simply shushing Jane Doe when she started to moan loudly Ms. Strong asked John Doe if he used his hand or anything physical to quiet her down. John Doe said no.

83.     The male panel member said that John Doe wrote in his statement that John Doe covered her mouth. John Doe was surprised and asked if it was in his written statement, asking "the one that I typed and emailed?" The panel members said yes. John Doe told the Panel he did not remember covering her mouth with his hand – or ever stating he did so in a written or oral statement - but reiterated that it would have only been for the sake of not embarrassing her and making a scene.

84.     John Doe later reviewed his submitted written statement and such a claim was not included anywhere in the statement.

85.    The panel members had knowingly communicated false facts about his statement to John Doe.

86.    The next day, October 24, 2014, John Doe was summoned to a meeting with Ms. Eyet.

87.    Ms. Eyet informed John Doe that he was found not responsible for drug/alcohol related offenses but that he was found responsible for a violation against policy regarding conduct unbecoming of a Christian community of respect. She then told that he had been found responsible for two charges regarding health/safety of another person and sexual assault. John Doe was shocked and asked her "Are you serious?!" She affirmed and said that the panel decided dismissal was the proper sanction.

88.    John Doe asked what the evidence was that led to that decision so he could better understand the decision. Ms. Eyet shook her head and said, "It's confidential."

90.    In an apparent effort to console John Doe, Ms. Eyet said, "Don't freak out: there is still the appeals process" and quickly told John Doe what the grounds were for an acceptable appeal.

91.    Ms. Eyet explained that even if John Doe chose to file an appeal, dismissal was still effective immediately, and John Doe had until 4:00 pm that same day to get his belongings and leave campus.

92.    Dean Finn was waiting in the hallway and told John Doe he had to leave immediately.  Dean Finn told Plaintiff that Residential Life could get me more boxes and if John Doe could not get all of his things John Doe could notify her and make arrangements. Campus safety then escorted Plaintiff back to his town house.

17

93.     Per the instructions of Patricia Shuster, Title IX Coordinator at Saint Anselm, John Doe emailed a copy of his signed appeal letter to Ms. Shuster and Dean Finn on or about October 29, 2014. It was also hand delivered to Ms. Shuster's office that same day and overnighted by mail.

94.     On or about November 4, 2014, John Doe received the appeal ruling by overnight mail from Ms. Shuster. John Doe's appeal had been denied.

**E.     John Doe's parents attempt to discuss his case with Saint Anselm Officials**

95.     On or about December 19, 2014, John Doe's father attempted to discuss his son's situation with Dean Finn. John Doe's father asked for an opportunity to have the College reconsider its decision on John Doe's case and they could arrange for an opportunity to discuss this matter with the college President, Dr. Steven DiSalvo. Dean Finn responded that she could not comment on the situation anymore since John Doe's father had gotten lawyers involved (a previous attorney had sent a letter to Saint Anselm on behalf of John Doe and his family).

96.     Dean Finn also stated that all correspondence must go through the Title IX coordinator, Ms. Shuster, and indicated that while she is very respectful of John Doe's situation and position, she has no involvement or authority on this matter.  John Doe's father questioned Dean Finn about this, given her prior statements to them that she has the sole responsibility of confirming the appropriateness of the ruling and sanctioning.  Dean Finn did not respond to that question, but agreed to pass on the request for a meeting with the college president on this issue.

97.     Later that same day, John Doe's father contacted Ms. Shuster to convey the same information and requests as they had with Dean Finn earlier. Ms. Shuster also noted that, because

lawyers are now involved, she cannot comment on the situation, and also agreed to pass on the request for a meeting with the President.

98.     That same day, John Doe's father left a message for President DiSalvo to ask if he would consider granting John Doe's father an opportunity to meet with him regarding his son's situation. John Doe's father pointed out in the message that he was concerned that the process followed in handling his son's situation was not consistent with the college's Benedictine principals, which John Doe's father believed would warrant attention at his level.

99.     On or about January 15, 2015, John Doe's father left a message from Mr. Ward informing him that Ms. Shuster had not called him.

100.    On or about February 11, 2015, having still not heard from Ms. Shuster, John Doe's father left a message for Ms. Shuster requesting a meeting.

101.    On or about February 13, 2015, John Doe's father spoke with Ms. Shuster by teleconference.  Ms. Shuster indicated that she was willing to meet with John Doe's father under certain conditions. She acknowledged his position and asked that their meeting focus on discussing options for transferring John Doe's credits to another school. John Doe's father agreed to that, and they set a tentative meeting date of March 13, 2015 with a back-up date of March 20, 2015.  Ms. Shuster indicated that Dean. Finn would be joining the meeting as well.

102.    On or about February 26, 2015, John Doe's father received an email from Ms. Schuster cancelled the March 13, 2015 meeting. John Doe's father emailed Ms. Shuster requesting that she reconsider her decision to cancel the March 13, 2015 meeting – considering the severity of the situation and impact the matter has on John Doe and his family. John Doe's father noted his willingness and desire to discuss the transfer of John Doe's credits, as well as

19

what could be expected to be included on John Doe's transcript. John Doe's father never received a response to this email.

103.   On or about March 3, 2015, John Doe's father spoke with a receptionist at the office of President DiSalvo and conveyed to the receptionist his desire to meet with the President for approximately fifteen minutes and to notify him of Ms. Schuster's unwillingness to meet with him.  John Doe's father offered to either bring John Doe with him or have a notarized release signed by John Doe to address any HIPPA concerns.

104.   More than one week later, having not received a response from Ms. Schuster, Dean Finn, or President DiSalvo, John Doe's father left another message for President DiSalvo and again received no response to this message. That same day, John Doe's father left another message for Ms. Schuster and again did not receive a response to this message. Also on the same day, John Doe's father left a messages for Dean Finn, and spoke with Dean Finn's receptionist who informed him that Dean Finn would no longer accept any calls or messages regarding John Doe's situation and that all such calls are to be directed to Ms. Schuster (who similarly has ignored John Doe's father's calls and requests for a discussion or meeting).

### F.  Saint Anselm Blatantly Treats John Doe Unfairly and Presumes Him Guilty

106.   From the moment John Doe was informed of Jane Doe's accusations against him, and thereafter throughout the appeal process and John Doe's father's efforts to discuss the situation with Saint Anselm's authority figures, Saint Anselm has treated John Doe unfairly, often assuming his guilt prior to the adjudication of the case, and treating him much differently than they treated students in similar situations.

107.    John Doe's expulsion from Saint Anselm is inconsistent with outcomes of similar cases Saint Anselm has adjudicated in the past.

108.    Upon information and belief, a student, "P.L.," was suspended for one year when he was found responsible for violently assaulting and forcibly raping fellow student, "L.H."

109.    Despite John Doe's provided information and statements regarding Jane Doe's admitted mental and emotional stability problems, St. Anselm refused to bring this information into question when determining Jane Doe's claims. In fact, the College refused to retrieve or review the text messages that John Doe had on his phone between himself and Jane Doe, in which they discuss their sexual encounter.

110.    Among the hearing panel members was Katherine Strong who had had disagreements with John Doe in the past and who brought a clear bias against John Doe to the panel.

111.    John Doe was never provided with any information regarding Jane Doe's statement or any of the witness statements, nor was he informed of the reasoning as to the decision to find him responsible. Therefore, John Doe was never given a full opportunity to negate or disprove any allegations against him.

112.    The hearing panel ignored the relevant testimony from John Doe's supporting witnesses, giving Jane Doe's statement extra weight, notwithstanding significant inconsistencies contained therein.

113.    John Doe was discriminated against by the College due to his sex. Were he not a male, he would not have been assumed and treated as guilty from the moment the accusation was made.

21

114.    Although the Code sites a "reasonable person's test" for finding a student responsible or not responsible for such offenses, St. Anselm erroneously concluded that John Doe was responsible, despite the fact that the Roommates testified to Jane Doe's coherent state on the night of the Incident.

115.    During John Doe's hearing, the panel members asked Plaintiff if he used his hand to cover Jane Doe's mouth at any point during their intercourse. John Doe responded that he did not. The panel members then told John Doe that he had mentioned in his written statement that he did in fact cover her mouth with his hand. This confused John Doe greatly and made him question his own memory of the events of the evening of the Incident. When John Doe later reread his submitted statement, there was no mention of covering Jane Doe's mouth with his hand. In fact, the panel members knowingly communicated false information to John Doe regarding his previous statements in an effort to botch and manhandle his testimony.

116.    Despite no physical evidence of rape or sexual assault, or known witness testimony supporting Jane Doe's allegations, John Doe was found responsible.

117.    John Doe was never provided the results of any alleged "investigation" conducted by the College, and as such was unable to adequately prepare himself for his hearing. Furthermore, any "investigation" conducted was wholly inadequate and failed to seek other potential evidence, such as text messages between John Doe and Jane Doe, phone records, available social media communications, and was not conducted in a manner required by law and the Code.

118.    John Doe was never provided the findings of fact of the hearing in order to be able to adequately prepare any appeal.

22

119.    The hearing panel members did not have the necessary training required by law or the Code. Additionally, the Code prohibited John Doe from retaining a "support person" who is a member of the bar of any state, notwithstanding the fact that the proceedings implicated important legal rights, including rights protected by the United States Constitution and relevant federal and state laws.

120.    It was clear by the hearing panel members' demeanors and lines of questioning that they had determined John Doe to be guilt long before the hearing commenced.

121.    Despite other remedies available to the hearing panel, the inconsistency of Jane Doe's statement, and the overwhelming evidence and testimony in support of John Doe, St. Anselm imposed the most severe and excessive sanction possible.

122.    Despite the fact that John Doe timely filed an appeal and pointed out procedural errors regarding the nature of the investigation, his right to the information necessary to accurately defend himself, the questionable compositions of the panel, lack of training of the panel members, and new evidence available to him after the hearing, Ms. Shuster rendered the decision to deny his appeal, effectively "rubber stamping" the decision of the panel.

123.    Despite the fact that their son was six weeks away from completing his undergraduate degree, the fact that they had spent a significant amount of money on his education thus far, and the fact that Defendant's decision effectively ruined their son's life, John Doe's parents were unable to get the attention of any Saint Anselm faculty members with authority in this matter, despite desperately seeking a meeting for months. Rather, St Anselm's agents, Ms. Shuster, Dean Finn, and President DiSalvo essentially gave John Doe's parents the run-around before completely ignoring their calls and emails.

**G.**   **John Doe's Entire Future is Severely Damaged by Saint Anselm's Actions**

124.   As a result of Saint Anselm's blind acceptance of the accusations made by Jane Doe, defective procedures and unfair punishment, John Doe's reputation is tarnished, his educational career is at a standstill and his future career prospects are ruined.

125.   Saint Anselm's sanction of suspension has not only interrupted his education, but has also left a stain on his academic record that will limit his ability to complete a Bachelor's Degree and may ultimately prevent him from pursuing a career in criminal justice.

126.   As a result of Saint Anselm's actions, John Doe's parents' financial resources used to provide John Doe with an education at an esteemed four-year institution have been squandered.

127.   Any attempt to move on with his future in the face of Saint Anselm's arbitrary and capricious decisions will be met with great resistance and little success.  It is unlikely that would be accepted as a transfer student for an undergraduate degree at an institution with a similar academic reputation as that of Saint Anselm's.  It is equally unlikely that he will be employed in any type of law enforcement office given the Saint Anselm's finding that he was responsible for "sexual misconduct."

128.   As John Doe was in his last year at St. Anselm, transferring to another school would be a significant financial burden. He is unable to get a refund on the tuition spent for the last (almost completed) semester at St. Anselm and would be forced to pay more money for multiple semesters at a different school, since it is improbable that all of his credits would transfer to a new school. Therefore, John Doe would have to repeat classes and pay even more

money in order to obtain a degree. Considering John Doe only had six weeks left before he was able to graduate from Saint Anselm, his expulsion has greatly deterred his future.

**IV. <u>Causes of Action</u>**

**FIRST CAUSE OF ACTION**
**<u>Violation of Title IX of the Education Amendments of 1972</u>**
**(Erroneous Outcome)**

129.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

130.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

131.    Upon information and belief, Saint Anselm receives federal funding for research and development.

132.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice).  Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

133.    In January, 2001, the United States Department of Education, Office for Civil Rights, published a set of compliance standards for Title IX educational institutions to apply in sexual harassment matters, including standards for "Prompt and Equitable Grievance

25

Procedures" and "Due Process Rights of the Accused."  66 F.R. 5512 (referred to below as "OCR Standards").

134.    The OCR Standards require schools not only to "ensure the Title IX rights of the complainant," but also to "accord [] due process to both parties involved."

135.    The OCR Standards require schools to adopt "prompt and equitable" procedures that "accord due process to both parties involved" including, at a minimum:

    (a)    "Notice . . . of the procedure, including where complaints may be filed";
    (b)    "Application of the procedure to complaints alleging [sexual] harassment...";
    (c)    "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";
    (d)    "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and
    (e)    "Notice to the parties of the outcome of the complaint..."

136.    The OCR Standards require Title IX schools to ensure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

137.    Saint Anselm's overall sexual misconduct complaint program fails to comply with the OCR standards in several ways, including (but not limited to):

    (a)    Adopting procedures that afforded greater prerogatives and protections to the (female) accuser than to the (male) accused.
    (b)    Failing to include a meaningful definition of the term "consent." and
    (c)    Failing to provide adequate training, but instead conducting group meetings for staff in which they participate in "academic exercises" to discuss hypothetical scenarios involving student misconduct.

138.    In its pre-hearing investigation of the complaint against John Doe, Saint Anselm University failed to comply with Title IX's due process standards generally, and the OCR Standards in multiple ways, including without limitation:

(a)    Failing to provide John Doe with information regarding accuser's allegation so he may be fully aware of the charges against him.

(b)    Failing to perform a thorough and impartial investigation of all evidence from both parties.

(c)    Failing to interview and consider the testimony of all of John Doe's named witnesses.

(d)    Failing to investigate beyond the materials voluntarily provided by the parties.

(e)    Failing to retrieve documentary evidence (text messages and social media communications) they were made aware of.

(f)    Failing to obtain or review critical physical evidence (medical records).

(g)    Failing to provide John Doe with the results of the investigation in so he may be adequately prepared for his hearing.

(h)    Failing to provide John Doe with the findings of fact of his hearing so he may adequately prepare an appeal.

(i)    Purposefully and knowingly feeding John Doe false information regarding his previously submitted statements, in an effort to botch his testimony.

(j)    Ignoring and/or summarily rejecting John Doe's reasonable requests for additional discovery or continuances, resulting in the discovery of major evidentiary gaps at the hearing which could not be addressed appropriately at that time.

139.    In its conduct of the adjudicatory hearing, Saint Anselm University failed to comply with Title IX's due process standards generally, and the OCR Standards in multiple ways, including without limitation:

(a)    Effectively presuming John Doe's guilt before an investigation into the Charges was underway.

(b)    Failing to challenge Jane Doe's numerous inconsistencies in her statements or to consider seriously the lack of corroborating photographic evidence of her claims of violence.

(c)    Failing to adequately consider exculpatory evidence or interview key witnesses in support of John Doe's defense.

140.    In reaching its decision and imposing sanctions on John Doe, Saint Anselm University deprived John Doe of the due process and equal protection rights required by the OCR Standards by, among other things:

(a)    Finding John Doe responsible as charged under flawed procedures notwithstanding the lack of evidence to corroborate Jane Doe's allegations.

(b)     Finding John Doe responsible of assault despite extensive evidence of consent including John Doe's statement, corroborating witnesses, Jane Doe's concessions in her testimony of providing consent and significant issues with Jane Doe's credibility.

(c)     Failing to provide a written statement of the reasons for its finding of John Doe's responsibility, or the basis for the sanctions it imposed.

(d)     Imposing sanctions that were unwarranted and disproportionate to the severity of the charges levied against him and without any consideration of his clean disciplinary record at Saint Anselm, the submission of numerous character statements by individuals who have known John Doe for years.

141.    Saint Anselm has deprived John Doe, on the basis of his sex, of his due process and equal protection rights through the promulgation of guidelines and regulations that are unfair and imbalanced, and the failure to implement the limited protections that appear in those guidelines and regulations

142.    Saint Anselm's flawed program and mishandling of John Doe's case were symptomatic of a broader culture of inherent, systematic and intentional gender bias against male students accused of sexual misconduct, through which male students are unable to receive a fair and impartial student conduct process when a complaint of sexual assault is made against them by a female student.

143.    Saint Anselm sacrificed John Doe's rights to the expediency of accommodating institutional pressures.  During the pendency of John Doe's case, Saint Anselm was under investigation by the Department of Education Office of Civil Rights for its handling of sexual misconduct cases under Title IX, and faces severe financial consequences if the Department determines that Saint Anselm does not deal with sexual assault in a way the Department feels is appropriate.

144.    Saint Anselm has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a

28

presumption of guilt.  Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Saint Anselm on the basis of his sex.

145.    Upon information and belief, former and present Saint Anselm employees and/or administrators:

(a)    Recognize the great miscarriage of justice to the male accused students in sexual misconduct cases at Saint Anselm, but are unable to change things because they are fearful of losing their jobs.

(b)    Recognize that Saint Anselm treats males as "guilty until proven innocent" in cases of sexual misconduct and have a pattern and practice of taking the female student's allegations at face value and banishing male students from campus without first hearing the male student's version of the story.

146.    Saint Anselm's policies effectuate a failure of due process for the student population, especially the male student population, in their current state because they encourage and facilitate the reporting of potentially false reports of sexual misconduct and/or other grievances without any recourse for those who may be falsely accused.

147.    Saint Anselm's intent to discriminate against male students accused of sexual misconduct is evident in, *inter alia*, Saint Anselm's knowledge of this significant gender-based statistical disparity, and its insistence on maintaining policies that carry out these pro-complainant and anti-respondent biases.

148.    Male respondents in sexual misconduct cases at Saint Anselm are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

149.    Saint Anselm's gender-biased policies also suits its institutional convenience, accommodating pressures imposed upon it by the recent national media focus on campus sexual

misconduct and Saint Anselm's investigation by the Department of Education Office of Civil Rights.

150.    Based on the foregoing, Saint Anselm engaged in a series of actions that ultimately resulted in the Panel's erroneous finding that John Doe was responsible for physical harm to Jane Doe and sexual misconduct. The Panel's Decision was the result of disparate treatment of John Doe on the basis of his male gender.

151.    In the face of damning contradictory evidence, the Panel's finding that John Doe was responsible for the misconduct alleged is fatally flawed.

152.    The erroneous outcome of the Hearing and Appeal can therefore only be attributed to gender bias against males in cases involving allegations of sexual misconduct. This bias is reflected in the patterns of decision making and procedural missteps demonstrated by Saint Anselm throughout the entire investigative process.

153.    Moreover, upon information and belief, in virtually all cases of campus sexual misconduct at Saint Anselm, the accused student is male and the accusing student is female. Saint Anselm has created an environment in which it is impossible for a male student accused of sexual misconduct to receive the due process guaranteed by Title IX. This significant gender-based disparity demonstrates discrimination against male students on the basis of their sex. In fact, Saint Anselm treats male students accused of sexual misconduct as "guilty until proven innocent" based on invidious gender stereotypes.

154.    Saint Anselm is primarily concerned with its image and reputation to potential incoming students, rather than its obligations to provide a fair and equitable investigative process.

155.    Therefore, John Doe suffered an erroneous outcome when the Panel found him responsible for physical harm to Jane Doe and sexual misconduct. The Panel's Decision was the result of disparate treatment of John Doe on the basis of his male gender.

156.    Saint Anselm's violations of its obligations under Title IX proximately caused John Doe to sustain tremendous damages, including, without limitation, emotional distress, economic injuries, reputational damages, and the loss of educational opportunities and other direct and consequential damages.

157.    John Doe is entitled to compensatory damages for the harm he suffered as a result of Saint Anselm's violation of its Title IX obligations.

158.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION
## <u>Violation of Title IX of the Education Amendments of 1972</u>
### (Deliberate Indifference)

159.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

160.    On October 29, 2014, John Doe filed his Appeal to Title IX Coordinator, Ms. Shuster, citing disproportionate sanctions, procedural errors, and an utter disregard for due process.  As a result, Saint Anselm had actual notice of the procedural errors committed by Dean Finn and the panel members, their investigative and procedural missteps, failure to engage in impartial fact finding, failure to fairly weigh evidence presented by John Doe vs. Jane Doe, and overall institutional gender bias against John Doe as the male student accused of sexual misconduct during his student conduct proceeding, all of which led to the erroneous Decision.

31

161.     Despite this actual notice of Saint Anselm's misconduct and the resulting harm to John Doe,  St. Anselm failed and refused to take any steps to correct the misconduct and resulting harm to John Doe despite that he had the authority and obligation to take such corrective measures.

162.     St. Anselm's failure and refusal was the result of gender bias against John Doe as the male student accused of sexual misconduct.

163.     John Doe sustained and continues to sustain the effects of Saint Anselm's deliberate indifference.

164.     Saint Anselm's failure and refusal constitutes unlawful discrimination against John Doe on the basis of his male gender in violation of Title IX.

165.     Saint Anselm's failure and refusal proximately caused John Doe to sustain tremendous damages to his educational career and future employment prospects, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

166.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract

167.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

168.     Based on the aforementioned facts and circumstances, the College breached express and/or implied agreement(s) with John Doe.

169.    The College committed several breaches of its agreements with John Doe, including, without limitation:

> It is the policy of Saint Anselm College, while reserving its lawful rights where appropriate to take actions designed to ensure and promote the Benedictine, Catholic principles that sustain its mission and heritage, to comply with all applicable laws prohibiting discrimination on the basis of race, color, national origin, religion, sex, disability, marital status, age, sexual orientation, or veteran status in its employment, programs, or activities.

170.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

171.    John Doe is entitled to recover damages for St. Anselm's breach of the express and/or implied contractual obligations described above.

172.    As a direct and proximate result of the above conduct, actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

173.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION
### <u>Violation of the Covenant of Good Faith and Fair Dealing</u>

174.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

175.    Based on the aforementioned facts and circumstances, the College breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe by

meting out a disproportionate sanction of expulsion, notwithstanding the lack of evidence in support of Jane Doe's allegations of non-consensual sexual activity.

176.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

177.    John Doe is entitled to recover damages for the College's breach of the express and/or implied contractual obligations described above.

178.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Promissory Estoppel

179.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

180.    St. Anselm's various policies constitute clear and unambiguous representations and promises that the College should have reasonably expected to induce action or forbearance by John Doe.

181.    St. Anselm expected or should have expected John Doe to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that the College would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of St. Anselm's policies.

182.    John Doe reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Defendant.

183.    Based on the foregoing, St. Anselm is liable to John Doe based on Promissory Estoppel.

184.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

185.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Negligence

186.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

187.    St. Anselm owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care in the conduct of an impartial and thorough investigation of the allegations of sexual misconduct against him.

188.    St. Anselm breached its duties owed to John Doe.

189.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

190.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

191.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

192.    St. Anselm owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care in conducting the investigation of the allegations against him in a fair and impartial manner.

193.    St. Anselm breached its duties owed to John Doe.

194.    Such breach by St. Anselm created an unreasonable risk of causing John Doe emotional distress in that John Doe's academic and disciplinary record is irrevocably and irreversibly tarnished.

195.    As a direct and foreseeable consequence of St. Anselm's actions, John Doe sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

196.    The emotional distress was severe enough that it has resulted in illness and/or mental harm to John Doe, namely, John Doe has suffered from insomnia and anxiety since the commencement of the subject investigation. John Doe began meeting with a psychiatrist and taking anti-depressants as a result of St. Anselm's conduct.

197.    St. Anselm's extreme and outrageous conduct was the cause of John Doe's distress.

198.    Considering that John Doe's entire academic and future employment opportunities would suffer as a result of the adverse decision, St. Anselm should have recognized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm.

199.    John Doe's distress is reasonable in light of St. Anselm's conduct.

200.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### Declaratory Judgment

201.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

202.    Saint Anselm has committed numerous violations of the Parties' contracts and of federal and state law.

203.    John Doe's education and future career have been severely damaged.  Without appropriate redress, the unfair outcome of the hearing and the expulsion sanction will continue to cause irreversible damages to John Doe's educational career and future employment prospects, with no end in sight.

204.    As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of John Doe's formal student record at Saint Anselm.

205.    By reason of the foregoing, John Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that (i) Saint Anselm University's sexual misconduct investigation of John Doe

violated his contractual rights and his due process and equal protection rights, (ii) Saint Anselm University's findings of misconduct are illegal, null and void, and (iii) Saint Anselm University's current rules, regulations and guidelines are illegal in violation of Title IX.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**<u>Injunctive Relief</u>**

206.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

207.    By virtue of Saint Anselm University's violation of his contractual, due process and equal protection rights, John Doe has suffered irreparable harm for which money damages are inadequate.

208.    To address that harm, John Doe is entitled to injunctive relief from this Honorable Court ordering Saint Anselm to (i) reverse the outcome and findings made by Saint Anselm at John Doe's Hearings; (ii) expunge all negative references contained in John Doe's disciplinary record; (iii) remove all references of John Doe's expulsion from his education file and (iv) permanently destroy any record of John Doe's Hearing.

**IV.    <u>Prayer for Relief</u>**

**WHEREFORE,** for the foregoing reasons, John Doe demands the following relief from Saint Anselm:

(i)    An award of compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional distress, economic injuries, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)   A judicial declaration that: (i) the outcome and findings made by Saint Anselm at John Doe's Hearings were erroneous and illegal; (ii) John Doe's

38

disciplinary record is clear and free of misconduct and (iii) Saint Anselm's rules, regulations and guidelines are illegal as applied;

(iii)   The issuance of an injunction ordering Saint Anselm University to (i) reverse the outcome and findings made by Saint Anselm at John Doe's Hearings; (ii) restore John Doe's good standing at the University; (iii) expunge any negative references from John Doe's disciplinary record; (iv) remove the record of John Doe's deferred suspension from his education file and (v) permanently destroy any record of John Doe's Hearing.

(iv)   An award of the costs and expenses of suit;

(v)   Attorney's fees; and

(vi)   Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated:    Hanover, New Hampshire
          November 5, 2015

Respectfully submitted,

COLEANDERSON, PLLC

By: /s/ Carolyn Cole
Carolyn Cole, Esq.
N.H. Bar #14549
23 South Main Street, Suite 3I
Hanover, N.H. 03755
ccole@coleandersonlaw.com

        -and-

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff John Doe*

By: /s/ Andrew T. Miltenberg
Andrew T. Miltenberg, Esq. (*pro hac vice*
pending)
Diana R. Zborovsky, Esq. (*pro hac vice*
pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
dzborovsky@nmllplaw.com